IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

SUPERMERCADOS ECONO,

    **Plaintiff**

    **v.**

                     CIVIL NO. 97-2818 (JAG)

INTEGRAND ASSURANCE COMPANY;
et als.

    **Defendants**

---

### OPINION AND ORDER

GARCIA-GREGORY, D. J.[1]

On December 4, 1997, plaintiff Supermercados Econo ("Econo") brought a flood insurance money recovery suit against defendants Integrand Assurance Company ("Integrand"), Colonial Insurance Agency, Inc. ("Colonial"),[2] Atlantic Cold Storage, Inc. ("Atlantic"), and Ernesto Cabezas ("Cabezas"), (collectively "defendants") pursuant to the National Flood Insurance Act of 1986



---

[1] Yamil Jaskille, a second year student at the University of Puerto Rico School of Law, assisted in the research and preparation of this opinion.

[2] Econo and Colonial settled their claims and partial judgment dismissing the action against Colonial was entered on July 12, 2000. (Docket No. 46.)

1



("NFIA"), 42 U.S.C. §§ 4001-4129.  (Docket No.1.)  Econo claims that on September 10, 1996, Hurricane Hortense flooded Atlantic's warehouse where Econo's merchandise was stored and allegedly insured by Integrand under the National Flood Insurance Program ("NFIP"), and the terms and conditions of a Standard Flood Insurance Policy ("SFIP").  On June 24, 2002, this Court held a bench trial.  At the end of trial, on June 26, 2002, the Court ordered the parties to simultaneously submit their proposed findings of fact and conclusions of law within thirty (30) days. Upon review of the testimonial and documentary evidence presented at trial, and pursuant to Fed.R.Civ.P. 52(a), the Court issues the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1.  Atlantic is a corporation organized pursuant to the laws of Puerto Rico ("P.R."), with its principal office in San Juan, P.R.  At all times relevant to this action, Atlantic was engaged in the business of storing perishable property: dry and frozen items in its walk-in coolers located at its warehouse facilities in the area of Bechara Industrial Park ("Bechara"), P.R.  Cabezas was Atlantic's owner, president and principal shareholder.  Other shareholders were Leonel Diaz, Willy Sabina, Noel Diaz and Jorge Cabrera.  Atlantic purchased the building and warehouse facilities from an entity by the name of Tampa Maid Sea Products ("Tampa Maid.")

2.  Econo is a corporation duly organized and existing under

2

the laws of P.R., with its principal offices in Catano, P.R.  It is engaged in the purchase of perishables, dry and frozen goods for distribution to its members and/or participating firms.

3.  Colonial is a company doing business in P.R., as an insurance agency, organized pursuant to the laws of P.R. and with its principal offices in Hato Rey, P.R.  Colonial is authorized by the Commissioner of Insurance of P.R. to engage in the insurance business as an insurance agency.  At all times relevant to this action, Colonial was Atlantic's insurance agent.  It was also the general insurance agency through which the flood insurance policy object of this case was issued and renewed on a yearly basis from August 1994 through 1997.

4.  Integrand is a corporation organized pursuant to the laws of P.R., with its principal office at Rio Piedras, P.R.  Integrand is an insurance company authorized by the Commissioner of Insurance of P.R. to engage in the insurance business.  It is a participant in the Write Your Own ("WYO") Program of the NFIP, and is an insurance or servicing agent of the NFIP.  Integrand was the insurance carrier that issued the flood insurance policy covering the risk of loss of property and perishable items stored in the Bechara facility.

5.  Colonial is unauthorized to issue flood insurance policies, for it can not rate and quote the premium of the insurance.  Colonial is authorized, however, to receive premium payments on behalf of Integrand.  A SFIP issued by Colonial is

3

invalid until Integrand receives payment from the insured.  The renewal is therefore ineffective until Colonial sends to Integrand, and Integrand receives the insured's payment.

6.  Joseph Carn ("Carn") is Atlantic's insurance broker.

7.  On July 27, 1994, Carn faxed to Colonial Atlantic's insurance application.  Colonial then forwarded the application to Integrand.

8.  On August 1, 1994, Integrand approved the application and agreed to insure Atlantic under a WYO Program of the NFIP. Coverage was in place until August 24, 1995, date at which Atlantic had to renew the policy or let it expire.

9.  Between September 23, 1994, and September 27, 1994, Econo and Atlantic entered into a commercial agreement whereby Atlantic would receive at its Bechara storing facility, directly from the docks, Econo's goods.  There, Atlantic stored the merchandise until Econo ordered it to deliver the merchandise to one of its member supermarkets.

10.  On September 22, 1994, Econo requested that Cabezas through Colonial apply to Integrand for inclusion of Econo as an additional insured and loss payee under Atlantic's policy. Atlantic agreed to Econo's petition.

11.  Atlantic delegated to Carn, its insurance broker, the request that Econo be added to Atlantic's policy as an additional insured and loss payee.

4

12.  On September 23, 1994, Colonial received Carn's request and forwarded it to Integrand.  Integrand, as a WYO Company, only required a request from the agency, the agent, or the broker on behalf of Atlantic to proceed to issue an endorsement to include Econo as an additional insured and loss payee.

13.  On September 23, 1994, Integrand issued an endorsement to Atlantic's flood policy to include Econo as an additional insured and loss payee.  Econo paid nothing for the endorsement and the insurance premium.

14.  Integrand, in order to issue the endorsement, relied on the information that the insured and Colonial provided.  Integrand did not know that Econo, not Atlantic, was the sole owner of the merchandise.

15.  On August 24, 1995, Atlantic renewed the policy for another year.  This time, however, Atlantic requested that Colonial include Econo as a second named insured.

16.  Atlantic filed for bankruptcy in 1995.

17.  On November 29, 1995, through a public auction sale, the Bechara facility was transferred back to Tampa Maid.  Neither Atlantic nor Carn informed Integrand.

18.  On October 26, 1995, a corporation named United Cold Storage, Inc. ("United") was formed and registered in the State Department of P.R.  United's shareholders were Cabezas, Margarita de Jesus ("de Jesus"), Jorge Cabrera, Jorge Ochotorena, and Vidal. Atlantic continued to do business under United's name.

5

19.   United leased from Tampa Maid the Bechara facility and continued to provide Econo with the same storage and delivery service that Atlantic had previously offered.  United sent invoices to Econo, and Econo paid them.  Cabezas was Atlantic's and United's liason to Econo.

20.   On April 29, 1996, United's president, de Jesus, bought the Bechara warehouse from former owner Tampa Maid.  Integrand was not informed about the change in ownership.

21.   On September 10, 1996, Hurricane Hortense hit P.R.  The Hurricane's rains flooded the Bechara warehouse and damaged all merchandise stored therein.

22.   On September 11, 1996, Luis Juarbe ("Juarbe"), Econo's insurance broker, sent an employee to the Bechara warehouse to ascertain the status of Econo's merchandise.  Juarbe's employee did not see Econo's merchandise.  He learned that the Hurricane's water had flooded the warehouse and damaged Econo's goods.  Juarbe advised Econo to place a claim.  Econo requested Juarbe to file a claim under the flood insurance policy.

23.   On September 12, 1996, Integrand received a check from Colonial, dated September 5, 1996, to renew Atlantic's flood policy.  This check came in within the 30 day grace period to renew coverage policy.

24.   On September 18, 1996, representatives from the P.R. Department of Health destroyed Econo's perishable, dry and frozen food items impounded from the Bechara facility after the Hurricane.

6

25.   On September 18, 1996, Colonial requested Integrand to eliminate Econo from Atlantic's flood policy.

26.   On September 25, 1996, Integrand renewed Atlantic's policy with only one named insured.

27.   On November 14, 1996, Econo sent to Integrand a notification letter that informed its merchandise loss.   This informative letter attached a merchandise inventory that Cisco, Inc. had prepared on August 31, 1996.  The inventory valued Econo's merchandise at $131,423.54.  The letter was signed by Mr. Juan Barreto from Econo.

28.   Juarbe considered the notification sent to Integrand to be a proof of loss.  It was unsworn, and was submitted more than 60 days after September 10, 1996, when the rains from Hurricane Hortense flooded Atlantic's warehouse facilities and damaged Econo's merchandise stored there.

29.   The Federal Insurance Administrator did not issue Econo an express written consent to waive any of the SFIP's provisions.

30.   On November 19, 1996, Atlantic filed a signed and sworn proof of loss with Integrand.  Atlantic's proof of loss did not include the loss suffered by Econo for its damaged merchandise stored at Atlantic's warehouse facilities.

31.   On December 9, 1996, Integrand issued a check to Atlantic, including Econo and other third entities, representing the amount of the loss suffered by Atlantic.

7

32.  On December 12, 1996, Integrand issued a substitute check payable to Atlantic in the amount of $250,144.00.  It did not include, nor did it compensate Econo for its claimed property loss. Atlantic and/or Cabezas did not disburse to Econo any payment or compensation from the amounts received from Integrand.

## CONCLUSIONS OF LAW

### A. NFIP

33. Econo's claim is predicated on its allegation that it was insured under a SFIP.  The NFIA authorizes the federal government to establish the NFIP, a federally-subsidized program which provides flood insurance at below actuarial rates.  Congress enacted the NFIA following a growing concern that private insurance companies were unable to write economically feasible flood insurance policies.

Furthermore, Congress recognized that the NFIP could be feasible if both the Federal government and private insurers cooperated to achieve its goals.

In order to carry out the purposes of the law, Congress authorized the Federal Emergency Management Agency's ("FEMA") Directors "to establish and carry out a national flood insurance program which will enable interested persons to purchase insurance against loss resulting from... loss of real property or personal property related thereto arising from any flood occurring in the United States."  42 U.S.C. § 4011(a).

34. Since 1978, FEMA has operated both the NFIP and the NFIA.

8

See 15 U.S.C. § 2201.  FEMA's Director operates the NFIP Government Program "through the facilities of the Federal Government... ."  42 U.S.C. § 4071(a).  In doing so, he is authorized to use private insurance companies "as fiscal agents of the United States" and to enter into any necessary "contracts, agreements, or other appropriate arrangements" with insurance companies.  Id. at §§ 4071(a)(1); 4081(a).

In 1983, FEMA's Director created the WYO Program, which allows private insurers to write a SFIP under their own names as insurers. 44 C.F.R. § 62.23.  Insurance companies which participate in the WYO Program are known as WYO Companies.  Id.  All flood insurance policies issued by WYO Companies under the WYO Program must mirror the terms and conditions of the SFIP.  The SFIP's terms and conditions are non-negotiable and "no provision of the said documents shall be altered, varied, or waived other than by the express written consent of the Administrator through the issuance of an appropriate amendatory endorsement, approved by the [Federal Insurance] Administrator as to form and substance for uniform use. 44 C.F.R. §§ 61.4(b), 61.13(d), (e), 62.23(c), (d).  See also Phelps v. FEMA, 785 F.2d 13, 19 (1st Cir. 1986).  The SFIP established that "[n]o suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with ... ."  SFIP Art. 8(T).

Premiums collected by WYO Companies, after deducting fees and

costs, must be deposited in the National Flood Insurance Fund ("NFIF") in the United States Treasury. 42 U.S.C. § 4017(d); 44 C.F.R. Pt. 62, App. A, Arts. II(E) & VII(B). When the funds retained by WYO Companies are insufficient to satisfy outstanding claims and refunds, the WYO Companies must draw upon letters of credit from FEMA. 44 C.F.R. Pt. 62, App. A, Art. IV(A). In short, premiums collected on policies written by WYO Companies do not belong to those companies. <u>Newton v. Capital Assurance Co.</u>, 245 F.3d 1306, 1311 (11th Cir. 2001). Thus, claim payments on such policies are a direct charge on the United States Treasury. <u>See</u> <u>Id.</u>; <u>see</u> <u>also</u> 44 C.F.R. § 62.23(f).

35. Federal law clearly establishes that an insured must strictly comply with the terms and conditions of an insurance policy issued pursuant to a congressionally mandated program. <u>See</u> <u>Fed. Crop. Ins. Corp. v. Merrill</u>, 332 U.S. 380, 384 (1947). The Supreme Court has long held that the provisions of an insurance policy issued pursuant to a federal program must be strictly construed and enforced. <u>Id.</u> at 385. <u>See also</u> <u>Wagner v. Dir. FEMA</u>, 847 F.2d 515, 518 (9th Cir. 1988). In <u>Merrill</u>, the Supreme Court recognized a general "duty of all courts to observe the conditions defined by Congress for charging the public treasury." <u>Merrill</u>, 332 U.S. at 385. Lower courts have uniformly adhered to strict observance of flood insurance policy provisions.

36. The SFIP requires "the insured to submit a [signed and sworn] "proof of loss" to the insurer within 60 days of the alleged

loss... unless such time is extended in writing... ." <u>Phelps</u> 785 F.2d at 15. "Federal law has long recognized that an insured must comply strictly with the terms and conditions of a federal insurance policy." <u>Flick v. Liberty Mut. Fire Ins. Co.</u>, 205 F.3d 386, 390 (9th Cir. 2000). This is "because those insurers draw funds from the United States Treasury to pay flood loss claims." <u>Id.</u> at 387; <u>see also</u> U.S. Const. Art. I, § 9, cl. 7 (stating that funds may be drawn from the Treasury only by act of law); <u>Office of Personnel Mgmt. v. Richmond</u>, 496 U.S. 424, 434 (1990). "Since the flood insurance program is a child of Congress, conceived to achieve policies which are national in scope," the uniformity of decisions must be assured and courts <u>motu propio</u> should not create exceptions. <u>West v. Harris</u>, 573 F.2d 873, 881 (5th Cir 1978). Under NFIA, therefore, WYO flood insurance carriers must strictly construe and enforce all provisions of a standard flood insurance policy in processing any loss claims.

## B. Proof of Loss

37. The SFIP establishes specific requirements for recovery of flood insurance money by claimants. SFIP states that: "within sixty days after a flood loss, the insured [here Atlantic] is to submit to the insurer [here Integrand] a proof of loss, which is the statement of the amount the insured is claiming under the policy." 44 C.F.R. Pt. 61, App. A(1); SFIP Art. 8(O)(3). Said proof of loss must include, <u>inter alia</u>:

(1) the date and time of loss; (2) a brief explanation of how

the loss happened; (3) your interest (for example, "owner") and the interest, if any, of others in the damaged property; (4) details of any other insurance that may cover the loss; (5) changes in title or occupancy of the covered property during the term of the policy; (6) specifications of damaged buildings and detailed repair estimates; (7) names of mortgagees or anyone else having a lien, charge, or claim against the insured property; (8) details about who occupied any insured building at the time of loss and for what purpose; and (9) the inventory of damaged personal property described in J.3. above.  Id. at Art. 8(O)(6).

No suit may be brought unless the policyholder has complied with all of the requirements of the policy. Id. at Art. 8(T); 9(R). The SFIP also states that:

> The insurance adjuster whom the Insurer hires to investigate the claim may furnish the Insured with a proof of loss form, and she or he may help the Insured to complete it.  However this is a matter of courtesy only, and the Insured must still send the Insurer a proof of loss within 60 days after the loss even if the adjuster does not furnish the form or help the Insured complete it.  Id. at Art. 8(O)(6).

38.  In the case at hand, Econo did not file a signed and sworn proof of loss within 60 days after the loss, which would be the date of passage of Hurricane Hortense through Puerto Rico.

12

39.  The pertinent SFIP's clause is not ambiguous and failure to comply with the SFIP requirements spelled out in the policy bars Econo's right to sue Integrand: "No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with... ." Id. at Art. 8(T).

40. The clear terms and conditions of the policy state that Econo's suit is not sustainable because it failed to comply with the sworn proof of loss requirement.  The First Circuit of Appeals has unequivocally ruled that failure to file the required sworn proof of loss bars the right to recovery.  See Phelps, 785 F2d at 16.

41.  "Congress, through a valid act of delegation to FEMA, has authorized payment of flood insurance funds to only those claimants that submit a timely sworn proof of loss."  (Emphasis added.) Flick, 205 F.3d at 394.  See also, 44 C.F.R. Pt, 61, App A(1), art. 9 (J), (6).  "The 60 day sworn proof of loss requirement is a condition precedent to payment for which all claimants are strictly accountable." Id., at 395.  "[G]iving notice of loss and providing a sworn proof of loss statement are separate and distinct requirements of the policy.  The policy calls for written notice of loss to be given as soon as practicable and a formal proof of loss statement to be submitted within 60 days after the loss.  Gowland v. Aetna, 143 F.3d 951, 954 (5th Cir. 1998).  "An insured's failure to provide a complete, sworn proof of loss statement, as required

13

by the flood insurance policy, relieves the federal insurer's obligation to pay what otherwise might be a valid claim." Id. An insured may not recover under a SFIP unless all of the policy requirements, including the timely signed and sworn submission of a proof of loss, have been satisfied.

42.   Econo's failure to comply with federal flood insurance policy requirements regarding a timely proof of loss to Integrand bars this action as a matter of law.

43. Econo's complaint against Integrand must, therefore, be dismissed for failure to comply with the SFIP that requires submitting to the insurer a proof of loss within 60 days after a flood loss.

C. Bailees' goods are excluded from coverage under the SFIP

44.   Atlantic executed a bailment contract with Econo, whereby title to the merchandise was retained by Econo and Atlantic acted as a bailee of Econo's goods.  This bailment agreement was also in place when United operated the warehouse facilities.

45.   The SFIP is governed by federal common law.  SFIP states that "[t]his policy is governed by the flood insurance regulations issued by FEMA, the [NFIA],... and Federal common law."  SFIP Art. 9.  Accordingly, The Court must decide whether Econo's merchandise stored at the Bechara warehouse were bailees' goods and therefore excluded from SFIP coverage.

46.   Neither the insurance regulations issued by FEMA nor the NFIA clearly define what constitutes bailees' goods.  Therefore,

14

the Court looks to Federal common law.  A bailment "is the delivery of goods by their owner to another for a specific purpose, and the acceptance of those goods by the other, with the express or implied promise that the goods will be returned after the purpose of the delivery has been fulfilled."  Goudy & Stevens, Inc. v. Cable Marine, Inc., 924 F.2d 16, 18 (1st Cir. 1991).  Black's Law Dictionary defines bailment as

> a delivery of goods or personal property, by one person (bailor) to another (bailee), in trust for the execution of a special object upon or in relation to such goods, beneficial either to the bailor or bailee or both, and upon a contract, express or implied, to perform the trust and carry out such object, and thereupon either to redeliver the goods to the bailor or otherwise dispose of the same in conformity with the purpose of the trust.

47.  The term "bailee" includes a person who by a warehouse receipt, bill of lading, or other document of title acknowledges possession of goods and contracts to deliver them.  Any delivery of personal property for a specific object or lawful purpose may constitute a bailment, provided that the indicia of a bailment relationship are present.  A lease agreement may thus create a bailment, as will the delivery of property to another under an agreement to repair it or perform other services upon it.  Other transactions to which the bailment law applies include: (1) the lending of personalty to a bailee for his or her use; (2) the

delivery and acceptance of custody of personal property for safekeeping, transportation, or storage; and (3) the delivery of goods to a factor for consignment sale.  See U.C.C. Art. 7; See also Am. Jur. 2d. Bailment § 5 and cases cited therein.

48.   The relation between Atlantic, and later United, with Econo consisted in the storage by Atlantic and United of Econo's merchandise and its delivery upon Econo's instructions.  At no point Atlantic, and/or United acquired title to the goods.  Econo's merchandise stored at the Bechara warehouse were bailees' goods and were, therefore, excluded from coverage under the SFIP.

49.   "Generally, in order for a bailee to be held liable for damage to the bailed object, the bailor must establish that the bailee acted negligently in the performance of its duties and that its negligence was the proximate cause of the damage." Goudy & Stevens, Inc., 924 F.2d at 18 (citing Commercial Molasses Corp. v. N.Y. Barge Corp., 314 U.S. 104, 110 (1941)).  However, "when the bailor shows delivery to a bailee and the bailee's failure to return the thing bailed, he makes out a prima facie case of negligence against the bailee," and it "then becomes the duty of the bailee to come forward with the evidence to explain [its] default by showing facts and circumstances sufficient in law to exonerate [it] from liability for the damage." Chanler v. Wayfarer Marine Corp., 302 F.Supp. 282, 285 (D. Me. 1969) (citing Trawler Jeanne d'Arc v. Casco Trawlers, 260 F.Supp. 124, 138 (D. Me. 1966)).  The rationale is that: "since the bailee is generally in

a better position than the bailor to ascertain the cause of the loss, the law lays on it the duty to come forward with the information it has available." Goudy & Stevens, Inc., 924 F.2d at 19. (citing Commercial Molasses Corp., 314 U.S. at 110.

50.    Econo agreed with Atlantic for Atlantic to store and deliver Econo's merchandise.    Atlantic became a trustworthy bailor of Econo's merchandise.    Atlantic was aware that the Bechara warehouse was located in a geographical area prone to flooding. Atlantic could foresee that the intensity of a hurricane - in this case Hortense - could result in flooding and the damage to stored merchandise due to heavy rains.    In 1991, a hurricane had flooded Atlantic's facility.    Based on its awareness and experience of potential flooding, Atlantic should have taken affirmative measures to preserve Econo's merchandise.    By failing to adequately safeguard Econo's stored goods Atlantic has been negligent, and is, therefore, liable to Econo for Econo's merchandise loss.

51.    In this case, the default of Atlantic and Cabezas was entered by the Court.    "[A] default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is... susceptible of mathematical computation." KPS & Associates, Inc. v. Designs By FMC, Inc., 318 F.3d 1, 19 (1st Cir. 2003) (citing Flaks v. Koegel, 504 F.2d 702, 707 (2nd Cir. 1974). See also Fed.R.Civ.P. 55(b)(2). The parties, however, stipulated in their pretrial order that both Atlantic and Cabezas were liable to Econo for the value of the

17

merchandise lost set at $131,423.54.   Additionally, during trial this amount was established as truly reflecting Econo's loss. Hence, Atlantic and Cabezas must jointly and severally compensate Econo for its loss in the amount of $131,423.54.

52.  Accordingly, judgment shall be entered dismissing Econo's claims against defendant Integrand and granting such claims against Atlantic and Cabezas jointly and severally in the amount of $131, 423.54.


IT IS SO ORDERED.

In San Juan, Puerto Rico, this 28th day of February, 2003.



JAY A. GARCIA-GREGORY
U.S. DISTRICT JUDGE

18