UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| SUPERMERCADOS ECONO<br><br>    Plaintiff<br><br>    vs.,<br><br>INTEGRAND ASSURANCE COMPANY;<br>COLONIAL INSURANCE AGENCY, INC.;<br>ATLANTIC COLD STORAGE, INC.;<br>ERNESTO CABEZAS, et als.<br><br>    Defendants | CIVIL NO. 97-2818 (JAG)<br><br><br><br>CIVIL ACTION; BREACH OF<br>CONTRACT AND DAMAGES |

**INTEGRAND ASSURANCE COMPANY'S
BRIEF IN COMPLIANCE WITH ORDER**

*TO THE HONORABLE COURT*

**COMES NOW**, co-defendant INTEGRAND ASSURANCE COMPANY through the undersigned counsel, and to this Honorable Court respectfully states, alleges and prays:

Pursuant to the order issued by this Honorable Court, the appearing party is hereby submitting its brief on the issue of Econo's loss payee claim. Integrand requests this Court to consider the Proposed Findings of Facts and Conclusions of Law submitted on July 24, 2002, as incorporated herein.

**FINDINGS OF FACT**

1. In 1994, Econo and Atlantic entered into a commercial relationship whereby Atlantic stored Econo's frozen and perishable goods at Atlantic's warehouse located at Blay Street, corner with Mariani Peralta, in the Bechara sector, Puerto Nuevo, San Juan, Puerto Rico (hereinafter referred to as the "Bechara warehouse" or "Atlantic's warehouse").

2

2. Prior to the beginning of the commercial relationship, Econo requested from Atlantic that it maintain flood insurance to cover Econo's merchandise stored at the Bechara warehouse. At all times relevant to the request, Econo was advised by its insurance broker, Mr. Luis Juarbe.

3. As understood by Mr. Juarbe, the relationship contemplated between Atlantic and Econo at the time of the meeting in 1994 included a certain type of joint venture where both Atlantic and Econo would have an insurable interest in the merchandise to be stored. Mr. Juarbe's testimony as to his understanding of this relationship was as follows:

"Q. So do you understood that **they were going to buy merchandise together** and that –

    (1)    One of the possibilities.

Q. Right.
I am not saying that that is what happened. I am saying that that's what you understood at the time of that meeting.

A. Econo was going to store there, so they needed to be first insured. There would need to be an additional insured. **They needed to make sure they were loss payees because they were going to put money to buy machinery**. Those were the things that were spoken about there.
They were going to store there, but they were going to – Mr. Cabezas was going to provide some work over there so Mr. Cabezas was going to put some money to buy merchandise with them. There were all kinds of things there.
So – and if there was property for Econo there, in order to have coverage they would have to have – to be an additional insured, so I placed them as an additional insured.

Q. **Did you place Econo as a loss payee relying on the contemplated financial relationship between -- whereby Econo would finance some equipment** –

A. **On the whole thing**." (Emphasis supplied).

4. As a matter of fact, Mr. Juarbe admitted in his testimony that he was aware that bailee's goods were excluded under this policy. Trial transcript, First day of Trial, PP. 181:22 – 182:8.

3

5. Based on Mr. Juarbe's understanding of the contemplated commercial relationship, he advised Econo to request from Atlantic that Econo be included as an additional insured and a loss payee in Atlantic's flood insurance policy. Atlantic requested its insurance broker at the time (1994), Mr. Joseph Carn, to procure such insurance. Mr. Carn proceeded to fill on behalf of Atlantic a Flood Insurance Application and completed the same on July 27, 1994. Econo did not pay any amount of money for the endorsement naming it as an additional insured and loss payee in Atlantic's policy nor did it pay for the insurance premium. See, First Day Trial Tr., P. 79.

6. The responsibility to ascertain the correctness of the information by which the endorsement was procured was of the agency, the agent or the broker of Atlantic. Integrand has the right to rely on the correctness of the information provided to it, pursuant to the SIFP's Insuring Agreement Part.

7. The actual relationship between Econo and Atlantic was that Atlantic would receive Econo's goods at its Bechara warehouse directly from the docks. Atlantic stored the merchandise until it was ordered by Econo to be delivered to one of its member supermarkets. The title to the merchandise would always lie with Econo and at no time whatsoever did the merchandise belong to Atlantic. There never was the contemplated joint venture between Econo and Atlantic which Mr. Juarbe referred to. See, First Day Trial Transcript, PP. 17:21 – 19:4; 51:9 – 52:14; 92:2-15; 104:11-24; and, Third Day Trial Transcript, PP. 19:6-16; 38:10 - 39:18.

8. On October 26, 1995 a corporation by the name of United Cold Storage, Inc. (hereinafter referred to as "United") was created by filing a Certificate of Incorporation with the State Department of Puerto Rico. See, Third Day Trial Transcript, P. 20.

4

9. On November 29, 1995, Tampa Maid, Inc. foreclosed the Bechara warehouse from Atlantic. On April 29, 1996, the Bechara warehouse once again changed ownership from Tampa Maid, Inc. to Margarita de Jesús, President of United.

10. The shareholders and/or directors for Atlantic were not the same as the shareholders and/or directors for United. See, Third Day Trial Transcript, P. 20.

11. Around the time when United was created, Econo was notified by letter that the storage relationship with Atlantic had come to an end and that thereon forward United would be the entity storing Econo's merchandise at the Bechara warehouse. See, Third Day Trial Transcript, PP. 23-24; 25:2-9; 39:22-40:3; 41:2-5; 45:4-18; 53:19-23. Mr. Sergio Morales admitted in his testimony that they never discussed with Mr. Luis Juarbe, their insurance broker, the implications that the change of ownership in the warehouse might have on the flood insurance. See, First Day Trial Transcripts, PP. 81:13-21.

12. Shortly after, United began sending invoices to Econo for the storage of Econo's merchandise at the Bechara warehouse under the name of United Cold Storage, Inc. See testimony from Juan Barreto and Jorge Cabrera.

13. Upon receiving the invoices from United, Econo began making payments for the storage services at the Bechara warehouse to the order of United Cold Storage, Inc. See, Third Day Trial Tr., PP. 22-24.

14. On June 7, 1996, Integrand sent a letter to Colonial informing them about the flood insurance policies to expire during the month of August. Defendant's Exhibit G. On June 29, 1996, Colonial sent a letter to Mr. Joe Carn informing him that Atlantic's insurance policy was about to

expire on August 24, 1996. On July 3, 1996, Mr. Carn replied to Colonial to let the policy expire because the insured was no longer occupying the building. Defendant's Exhibit I. Neither Colonial nor Mr. Carn provided this information to Integrand.

15. On September 10, 1996 Hurricane Hortense passed through Puerto Rico and as a result the Bechara warehouse, including the cold storage facilities, was flooded. See, Stipulation number 6.

16. After knowing the damages caused by Hurricane Hortense, on September 12, 1996, Mr. Cabezas went to Colonial to pay the premium for Atlantic's insurance policy. He was instructed by Colonial that payment had to be made directly at Integrand, so he personally went there and paid it.

17. On September 18, 1996, Ms. Maria Elena Posada, from Colonial sent a fax to Ms. Damaris Báez at Integrand, requesting that Econo be removed as insured when Atlantic's policy was renewed. See, Joint Exhibit V.

18. On September 25, 1996, Integrand renewed Atlantic's flood policy with only one named insured.

19. Atlantic never disclosed to Integrand the fact that it had ceased to be the owner of the warehouse. As a matter of fact, Atlantic did not notify Integrand that Tampa Maid, Inc. foreclosed the warehouse on November 29, 1995 nor that Tampa Maid, Inc. had sold the warehouse to Margarita de Jesús, who was the owner at the time of the alleged loss on September 10, 1996. See, Third Day Trial Tr. PP. 48:6-9; 49:7-10.

20. Econo did not obtain from the Federal Insurance Administrator an express written consent to waive any of the provisions of the Standard Flood Insurance Policy.

6

21. As stipulated between the parties, Atlantic did not claim for Econo's losses nor did it receive payment for Econo's losses.

22. According to the testimony of Ms. Maria Elena Posada, from Colonial, she also obtained for Atlantic a bailee's policy for merchandise that belonged to others but was in their possession. Said policy was issued by Universal Insurance, not Integrand.  Second Day Trial Transcript, PP. 7:25 – 8-:11; 29:24 – 30:8.

Based on the foregoing Findings of Fact, we respectfully request this Court to make the following

## CONCLUSIONS OF LAW

Econo's claim to the effect that it was entitled to the insurance policy proceeds as loss payee is totally meritless, for the foregoing reasons:

**A. LOSS-PAYABLE CLAUSE**

Article 8 (N) of the SFIP states:

"**Loss Payable Clause (Applicable to contents items only):** Loss, if any, **shall be adjusted with the Insured and** shall **be payable to the Insured and loss payee as their interests may appear**."  (Emphasis added).

This loss-payable clause is known as a simple or open loss-payable clause, in which the loss payee is subject to such defenses as the insurer may have against the mortgagor (insured).  See, 4 *Couch on Insurance* §§65:9, 65:15 and 65:16; and, 5 Appleman, Insurance Law & Practice § 3335, at page 145.

Regarding this particular clause, Couch has expressed:

"**A loss payee clause of an insurance policy providing that a "loss, if any, under policy shall be payable to named insured and following loss payee(s) as their interests may appear**" –

7

commonly referred to as "ordinary", "open-mortgage clause" or "simple loss payable clause – confers upon the loss payee a third party beneficiary standing to bring an action against the insurer, although **it subjects the loss payee to any defenses an insurer might assert against a named insured, such as an insurer's refusal of payment to a named insured based on alleged fraud and misrepresentation**." 4 Couch on Insurance § 242:69.  (Emphasis added).

Econo cited Couch §65:22 before the Court of Appeals for the First Circuit to the effect that "Loss payee's rights under insurance policy are derivative of named insured's rights…" Brief of Appellant, P. 7.  Notwithstanding, said citation ends "…**when named insured has no right to recover, loss payee cannot recover under policy**".  This is clearly the situation of the case at bar.  See, also, *Northwestern National Casualty Company v. Khosa, Inc., et al.*, 520 N. W 2d. 771, at pages 774-775 (Minn. App., 1994); and, *Chrysler First Commercial Corp. v. State Farm Insurance Co.*, 646 N. E2d. 647, at pages 649-650 (Ill. App., 1995).

As Econo stated before the Court of Appeals, citing *Wometco Home Theatre, Inc. v. Lumbermens Mutual Casualty Company*, 97 A2d. 715 (NY, 1983) a "loss payee" is not itself an insured under the policy; it is merely the designated person to whom the loss is to be paid.  It is established that such a loss payee may only recover if the insured could have recovered."  In *Wometco*, the insurance policy contained a loss payable clause as the present case, in which loss was to be adjusted with the insured and be payable to insured and a loss payee "as their interests may appear".  The court expressed that the policy established a period to file suit and plaintiff's claim was filed after the expiration of that period, so even the insured could have not recovered.

In the case at bar, Atlantic should have not recovered for the following reasons:

1. Coverage under the SFIP, specifically excludes contents belonging to others not the owner of the building.  Coverage B of the SFIP states:

8

"Coverage B -- Personal Property

A. Subject to paragraphs B, C, and D, below, **this policy covers personal property which is** in or on the insured, fully enclosed building and is:

1. **Owned solely by the Insured**, or in common by the unit owners of a condominium, i.e., as to which each unit owner has an undivided ownership interest; or

2. In the case of a condominium, owned solely by a condominium association and used exclusively in the conduct of the business affairs of the condominium.

3. Such personal property is also covered while stored at a temporary location, as expressly authorized under this policy (see Article 5, paragraph B.2.).

B. When the insurance under this policy covers personal property (contents), coverage shall be for either household contents or other than household contents, but not for both.

1. When the insurance under this policy covers **other than household contents**, **such insurance shall cover**, subject to "Coverage A -- Building Property", paragraph 3.: Merchandise and stock, materials and stock supplies of every description, furniture, fixtures, machinery and equipment of every description **all owned by the Insured** and all while within the described enclosed building. **Bailees' goods are specifically excluded from coverage under this policy.**" (Emphasis added).

2. Atlantic's policy was null and void, since at least November 29, 1995

Clause E of the Standard Flood Insurance Policy states that:

"E. Voidance, Reduction or Reformation of the Coverage:

1. Voidance: **This policy shall be void and of no legal force and effect in the event that any one of the following conditions occurs**:

a. The **property listed on the application is not eligible for coverage, in which case the policy is void from its inception**;

b. …;

c. …;

d. In the event **any Insured or its agent** has:
(1) Sworn falsely; or
(2) **Fraudulently or willfully concealed or misrepresented any material fact including facts relevant to the rating of this policy in the application for coverage, or upon any renewal of coverage, or in connection with the submission of any claim brought under the policy**, in which case this entire policy shall be void as of the date the wrongful act was committed or from its inception if this policy is a renewal policy and the wrongful act occurred in connection with an application for or renewal or endorsement of a policy issued to the Insured in a prior year and affects

the rating of or premium amount received for this policy. Refunds of premiums, if any, shall be subject to offsets for the Insurer's administrative expenses (including the payment of agent's commissions for any voided policy year) in connection with the issuance of the policy" (Emphasis added).

This provision of the SFIP makes void and of no legal force and effect the entire policy when any insured or its agent has sworn falsely or fraudulently or willfully concealed or misrepresented any material fact to the insurer.

It was established by the evidence at trial that the Bechara warehouse ceased to be owned by Atlantic as of November 29, 1995, when the warehouse was foreclosed by Tampa Maid, Inc. Integrand's Exhibit D clearly established this fact, as well as that the building changed ownership once more on April 23, 1996 to Margarita de Jesús, the owner of the warehouse at the time of the loss on September 10, 1996. Atlantic never disclosed that fact to Integrand. Being the ownership of the property insured a material fact, such concealment and misrepresentation makes the entire policy void. Therefore, since November of 1995 the policy issued to Atlantic was void and of no legal force and effect, so Econo may not recover from Integrand.

The fact that, since July 1996, Atlantic's insurance broker requested Colonial to let the policy expire because insured was no longer occupying the building, but after the Hurricane, Mr. Cabezas immediately went to Colonial and then to Integrand to pay the premium, underscored the extent of his willful misrepresentations or concealment. Econo did know about the change in ownership and it even started a business relationship with United, so Atlantic and Econo, as well as Colonial, willfully concealed or misrepresented this material fact to Integrand. However, both filed

10

separate claims under the policy. It was due to this concealment and misrepresentations that Atlantic was paid, despite the fact that it was not entitled to recover and neither is Econo.

**B. INSURABLE INTEREST**

The insurable interest requirement applies to all types of insurance transactions and is frequently employed by the courts in the United States to implement the principle of indemnity. See, *Royal Ins. Co. v. Sisters of the Presentation*, 430 F 2d. 759 (9th. Cir., 1970). The insurable interest must exist as of the date of the loss and its extent should also be determined as of the date of the loss. 44 Am. Jur. 2d. Insurance §942.

As expressed by Couch:

"**The fact that a policy contains a mortgagee clause does not alter the principles governing insurable interest which admittedly would apply if there were no mortgage loss-payable clause**. Accordingly, **if the insured has no interest in the property, so that the policy is void against public policy, his or her mortgagee acquires no rights against the insurer by reason of a loss-payable clause**." 4 Couch on Insurance § 65:12. (Emphasis added).

See, also, 44 Am. Jur. 2d. Insurance §933: "An insurable interest is necessary to the validity of an insurance contract, whatever the subject matter of the policy, whether upon property of life. If there is no insurable interest the contract is void and unenforceable. In particular, **where an insurable interest does not exist at the time the contract for insurance was made, the insurance contract is void from its inception**".

Appleman, *supra*, also expressed: "A third person also has a lien upon the insurance money where he has an equitable interest in the subject matter and the insured agreed to insure for his

11

benefit; although in the absence of such an agreement, **one who has a mere lien on the insure property would ordinarily have no valid claim in the proceeds**." § 3332, at page 129.

A situation similar to the case at bar was decided by this District Court in *El Fénix de Puerto Rico v. Luis M. Serrano Gutiérrez, et al.* (Judge J. Pieras), 786 F. Supp.1065 (1991). Plaintiff Serrano bought a vessel, which was financed by First Federal Savings Bank. Serrano obtained an insurance policy and First Federal was the loss payee. Serrano sold the vessel to another person and more than a year after the sale he obtained another insurance policy in which First Federal was also the loss payee. A month after obtaining the second insurance policy, the vessel was forfeited in the British Virgin Islands. Both Serrano and First Federal made a claim to El Fénix de Puerto Rico, who denied coverage. The insurance company filed a declaratory judgment action claiming that the latest insurance policy was null and void because the named insured and loss payee lacked insurable interest in the vessel. The District Court ruled that named insured lacked insurable interest after selling the vessel and loss payee lacked insurable interest due to failure to record first preferred mortgage. The District Court cited in support of its decision *Banco Comercial de Puerto Rico v. Royal Exchange Assur. Corporation*, 71 F 2d. 933 (1st. Cir., 1934), in which the Court of First Circuit confirmed that plaintiff had no mortgage or security on the goods insured, which were destroyed by the willful act or the connivance of the assured. See, also, *Armburst v. Travelers Insurance Company*, 376 P 2d. 669 (Or., 1962), where the Supreme Court of Oregon determined that plaintiff failed to demonstrate that his assignor (loss payee in the policy) had an insurable interest in the truck.

12

In *Wilbanks & Wilbanks, Inc. v. Cobb*, 601 S. W2d. 601 (Ark. App., 1989), Wilbanks entered into an agreement to purchase laboratory equipment from Cobb and executed a security agreement covering all the equipment and inventory in the business. Four months later, Wilbanks also purchased new equipment, which was financed and another security agreement was signed on behalf of the bank. Wilbanks obtained an insurance policy covering all the equipment. A fire partially damaged the used equipment and completely destroyed the new equipment. Even though the total debt to Cobb was paid, he filed suit demanding the remaining proceeds from the insurance policy as loss payee. The court determined that Cobb had no insurable interest in new equipment either at the time of the making of the contract or at the time of the loss. According to the court, customary language in most insurance policies (as the present case) is that the proceeds of the policy are payable to the loss payee as his interest may appear and not as payee generally. For that reason, the court found that plaintiff's interest cannot exceed his interest in the insured property itself.

In *Airvac, Inc. v. Ranger Insurance Company*, 266 So 2d. 178 (Fla. App., 1972), the Florida Court of Appeals expressed: "If the mortgagor did not have or was not required to have an insurable interest, it could result in perpetration of a fraud upon an insurer as well as defeat the time-honored rule that in order to procure valid insurance, one must have an insurable interest. The reason for such a rule has been aptly stated by the First District in *Skaff v. United States Fidelity & Guaranty Co.*, 215 So 2d. 35, 36 (Fla. App. 1968) where the court stated that "the reason for the rule…is to prevent insurance companies from becoming wagering contracts in furtherance of public policy on wagering. In (the) absence of an (insurable) interest in the property to be insured, such a contract becomes in essence a wager which will not be sanctioned by the courts." As to wagering through insurance in a

13

property in which loss payee has no interest, see, *Sander v. Mid-Continent Ins. Co.*, 514 S.W2d. 634 (Mo. App., 1974).

In the present case, there is no question that Atlantic lacked an insurable interest in the property since November 29, 1995, when the property was foreclosed by Tampa Maid. Since Atlantic did not have an insurable interest, the policy was void since its inception and Atlantic was not entitled to payment. Econo admitted that Atlantic did not claim for Econo's losses nor did it receive payment for Econo's losses. Therefore, Econo had no insurable interest in the property or merchandise for which Atlantic received payment. Econo's creditor status, without more, cannot entitle it to coverage as loss payee under Atlantic's policy.

**ATLANTIC REQUESTED THAT ECONO BE REMOVED AS INSURED AND LOSS PAYEE IN ITS POLICY ON THE RENEWAL DATE**

Econo's evidence established that Colonial, acting on Atlantic's instructions, requested Integrand to remove Econo from Atlantic's policy "on the renewal date". According to Maria Elena Posada, formerly supervisor of underwriting at Colonial, the renewal date was August 24th, 1996. Ms. Posada admitted that Colonial's request was for August 24th since that was the renewal date.

When Colonial requested that Econo be removed from Atlantic's policy on the renewal date, i.e. August 24, 1996, Colonial acted negligently. Colonial was the entity who on behalf of the insured could order, as it did, Integrand to make changes to the policy. Econo's removal from Atlantic's policy was not an action of Integrand's volition, but Colonial's. Therefore, Colonial was negligent, but plaintiff already settled that negligence for $10,000.00.

**ESTOPPEL**

On the other hand, Econo cannot claim estoppel based on the fact that Integrand collected the premium and eventually paid the damages to Atlantic due to their willful misrepresentations regarding the change of ownership of the warehouse.

In *Jamal v. Travelers Lloyds of Texas*, 131 F. Supp. 2d 910, (2001), the District Court for the Southern District of Texas held that: "the Fifth Circuit has made clear that neither the federal government nor WYO carriers may be estopped from denying coverage under a SFIP when SFIP requirements, such as a timely submission of a proof of loss, have not been met." It further held, citing from *Gowland*, 143 F.3d [951 (5th Cir., 1998)] at 954 that **"[w]hen federal funds are involved, the judiciary is powerless to uphold a claim of estoppel because such a holding would encroach upon the appropriation power granted exclusively to Congress by the Constitution.** Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury.

The court further held in *Jamal, supra*, at page 919, that "a claim of estoppel requires that the party asserting it demonstrate that it lacked knowledge or the means of knowledge of the true facts." It also held that **"those who deal with the government are expected to know the law and may not rely on the conduct of Government agents contrary to the law. This expectation has also been extended to claimants who deal with a fiscal intermediary of the government.**"

Similarly, the Standard Flood Insurance Policy's requirements were not waived by the WYO Company. The Standard Flood Insurance Policy issued by Integrand cannot be amended nor can any of its provisions be waived without the express written consent of the Federal Insurance

15

Administrator. Furthermore, no action taken by the WYO Company under the terms of the policy can constitute a waiver of any of its rights. That express provision is contained in article 9(D) of the SFIP issued by Integrand and in 44 C.F.R. Pt. 61, App. A(1)(D). See, Joint Exhibit II. Article 9(D) of the SFIP states:

> **"Amendments, Waivers, Assignment:** This policy cannot be amended nor can any of its provisions be waived without the express written consent of the Federal Insurance Administrator. No action we take under the terms of this policy can constitute a waiver of any of our rights."

In this case, FEMA did not issue Econo or Atlantic a written consent to waive any of the provisions of the SFIP. Therefore, they were not entitled to be compensated. Moreover, the fact that Atlantic and Econo failed to comply with the aforementioned requirements of the policy, bars Econo's right to sue the insurance company. Clause T of the SFIP, states that:

> "T.   Action Against the Insurer: **No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with**, and unless commenced within 12 months next after the date of mailing of notice of disallowance or partial disallowance of the claim. An action on such claim against the Insurer must be instituted, without regard to the amount in controversy, in the United States District Court for the district in which the property shall have been situated." (Emphasis added).

In addition, pursuant to Article 8(O) (8) of the SFIP, Atlantic, Cabezas, Colonial and Econo could have been prosecuted or fined for their false statements and misrepresentation in the course of presenting their claims under the policy.

**WHEREFORE**, Atlantic should have not recovered, so Econo has no right whatsoever to the proceeds of Atlantic's flood insurance policy as loss payee; and the above captioned complaint against Integrand should be dismissed.

16

I hereby certify that on this date the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following: **Enrique Peral, Esq.** and **Modesto L. Rodríguez, Esq.**; and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participant: **Julio Torres Muñoz, Esq.**, Iturregui Plaza, 1135 65th Infantry Avenue, Suite 200, San Juan PR 00924.

In San Juan, Puerto Rico, this October 18, 2004.

S (Magaly Rodríguez de Vázquez)
MAGALY RODRÍGUEZ DE VÁZQUEZ
USDC NO.: 205010
**COBIÁN & VALLS**
PO Box 9066522
San Juan, PR 00906-6522
Tel: (787) 722-8400
Fax: (787) 721-2869